UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LEONARD JORDAN, JR.,

     Plaintiff,

v.                                     Case No. 3:16cv152-CJK

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

     Defendant.
_____/

## MEMORANDUM ORDER

This case is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Leonard Jordan, Jr.'s application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73 for all proceedings in the case, including entry of final judgment. Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are supported by substantial

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

evidence. The decision of the Commissioner, therefore, will be affirmed and Mr. Jordan's application for benefits denied.

## ISSUES ON REVIEW

Mr. Jordan, who will be referred to as claimant, plaintiff, or by name, raises three issues on appeal. He claims the ALJ erred in (1) "assigning little weight to the opinions of Dr. Gawlik and Dr. Schuka," (2) finding him able to perform the standing and walking required of light work, and (3) "mechanically relying on the Medical-Vocational Guidelines and failing to obtain vocational expert testimony regarding jobs Claimant can perform." Doc. 9, pp. 1-2.

## PROCEDURAL HISTORY

On January 28, 2015, Mr. Jordan filed an application for DIB, alleging disability beginning December 20, 2013, due to depression, anxiety, vestibular dysfunction, cognitive dysfunction, TBI, GERD, peripheral neuropathy affecting his upper extremities and feet bilaterally, vertigo, hearing loss, tinnitus bilaterally, and headaches. T. 98-99, 191-95. The application was denied initially on March 31, 2015, T. 137-40, and on reconsideration on April 30, 2015, T. 142-47. Mr. Jordan requested a hearing, which was held on September 22, 2015. T. 32, 54-97, 183-84. A few months later, the ALJ issued a decision denying benefits. T. 29-53. Mr. Jordan requested review by the Appeals Council, which upheld the ALJ's decision, making the ALJ's decision the final determination of the Commissioner. T. 1-10.

## FINDINGS OF THE ALJ

In her written decision, the ALJ made a number of findings relevant to the issues raised in this appeal:

- "The claimant has not engaged in substantial gainful activity since December 20, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*)." T. 34.

- "The claimant has the following severe impairments: residuals of electrical shock accident with complaints of diffuse body pain; dizziness and balance issues; cognitive (memory) impairment from electric shock; and lumbar degenerative disc disease (20 CFR 404.1520(c))." T. 34.

- "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." T. 35.

- "[C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally climb ladders, ropes and scaffolds. He cannot perform activities involving concentrated exposure to unprotected heights. He can frequently climb ramps and stairs. He can understand, remember, and carry out simple, repetitive instructions. He can persist at that level of complexity for eight hours a day, five days a week consistently." T. 36.

- "The claimant is unable to perform any past relevant work (20 CFR 404.1565)." T. 45.

- "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a))." T. 46.

- "The claimant has not been under a disability, as defined in the Social Security Act, from December 20, 2013, through the date of this decision (20 CFR 404.1520(g))." T. 47.

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). "Substantial evidence is something 'more than a mere

scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). A reviewing also court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has

been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[2]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work, "but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from performing past relevant work, he is not disabled.[3]

5.     Even if the claimant's impairments prevent him from performing past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, he is not disabled.

Step five (or step four in cases in which the ALJ decides a claimant can perform past work) is generally where the rubber meets the road.  At that point, the ALJ formulates the all-important residual functional capacity.  The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence; and (2) the claimant's subjective complaints.  Residual functional capacity is then used by the ALJ to make the

---

[3] Claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

ultimate vocational determination required by step five.[4]   "[R]esidual functional

capacity is the most [a claimant] can still do despite [claimant's] limitations.[5]   20

C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Often, both the medical evidence and the

accuracy of a claimant's subjective complaints are subject to a degree of conflict and

that conflict leads, as in this case, to the points raised on judicial review by the

disappointed claimant.

---

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[5] In addition to this rather terse definition of residual function capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 416.912(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 416.912(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations.   (See  § 416.913.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends or other persons.  (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

## FACT BACKGROUND AND MEDICAL HISTORY[6]

At the time of the ALJ's decision, Mr. Jordan was 51 years of age. T. 48, 189. He completed 1 year of college and previously worked as a heavy equipment operator and cable television installer. T. 199, 283. He alleged disability beginning December 20, 2013, due to depression, anxiety, vestibular dysfunction, cognitive dysfunction, traumatic brain injury, gastroesophageal reflux disease, peripheral neuropathy of the hands and feet, vertigo, hearing loss, bilateral tinnitus, and headaches. T. 282.

At the hearing before the ALJ, Mr. Jordan testified he suffered from physical and mental impairments which began after he was "shocked" in June 2013, which resulted in "a state of spasm holding 2 active wires for about 2 to 3 minutes," unable to move. T. 67; 69-70; 399. He said he began experiencing pain that same day, along with muscle burning and spasms. T. 399. He was in the U.S. Air Force Reserves at the time and became "basically non deployable," as he was unable to complete any physical resistance training. T. 65-67. Mentally, according to Mr. Jordan, his personality changed and he became "easily frustrated and prone to outbursts." T. 64. He also often felt disoriented with regard to time and date, was

---

[6] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record. Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

unable to drive much of the time, was unable to remember things, could not multi-task, was easily distracted, and had difficulty focusing and completing tasks due to cognitive impairment. T. 63-64, 68-69. At home, he used a big calendar and dry erase board to keep track of doctors' appointments; he sometimes used a tape recorder as well. T. 77. He felt he needed constant assistance with attending appointments. T. 77-78. Mr. Jordan's wife completed a third-party questionnaire on March 4, 2015, in connection with his claim for benefits, indicating "almost daily he's tired, irritable, dizzy, memory loss, can't multitask like he use[d] to, burning food, forget to brush teeth, put on deodorant etc. . . ." T. 324.

On or about April 28, 2014, Mr. Jordan saw psychiatrist Cris Jagar, M.D., of the Anchor Clinic, due to depression stemming from dizziness, nerve pain, and frequent "burning." T. 388. Mr. Jordan indicated he had never seen a psychiatrist or sought psychiatric treatment prior to the electrocution incident, had suicidal ideation in November 2013, had days of not wanting to get out of bed (but sleeping only 2-4 hours a day), and had "short term memory loss." T. 388. Dr. Jagar recommended Cymbalta for depression and nerve pain and referred him to a neurologist for neuropsychological testing, a sleep study, and possibly an EMG. T. 388.

Mr. Jordan first saw neurologist Roman Kesler, D.O., on May 21, 2014. T. 391-93. During an appointment on July 9, 2014, Mr. Jordan informed Dr. Kesler

that if he did not write things down, he would forget them. T. 416. He said if he went to the store without a list, he would have to call home and ask what he was supposed to get. T. 416.

Mr. Jordan consulted Hyperbaric Medicine, Inc., for ImPACT neuropsychological testing on September 22, 2014. T. 448-52. The testing showed verbal memory in the 1st percentile, visual memory in less than the 1st percentile, visual motor speed in the 5th percentile, and reaction time in the 2nd percentile. T. 448-52.

Mr. Jordan had further neuropsychological testing with Nina J. Gawlik, Psy.D., over the course of approximately 6 appointments between September 4, 2014, and November 12, 2014. T. 595-603. In order to rule out frontal lobe deficits and assess overall neuropsychological integrity, Dr. Gawlik administered Comprehensive Trail-Making Tests ("CTMT"). T. 600. Mr. Jordan had 5 tests, scoring in the 1st percentile on the first, less than the 1st percentile on the second, less than the 1st percentile on the third, the 4th percentile on the fourth, and less than the 1st percentile on the fifth. T. 600. Based on those results, Dr. Gawlik diagnosed "clinical characteristics" of Mild Neurocognitive Disorder Due to Traumatic Brain Injury, noting previous diagnoses of Posttraumatic Stress Disorder ("PTSD") and Major Depressive Disorder. T. 602-03.

On or about August 4, 2015, Mr. Jordan presented to the Amen Clinic in Atlanta, GA, for follow-up treatment of cognitive difficulties, where he was evaluated by Nelson Bennett, M.D. T. 714-68. Claimant described himself as a "normal guy trying to get answers about when my life will be normal again" and a great person before the incident. T. 734. He reported suffering manic episodes 2-3 times per month. T. 735. He completed a Beck Depression Inventory, scoring 48, which is classified as "severe" (scores between 29 and 63 indicate severe symptoms). T. 741. He also underwent a qEEG or "brain mapping," which recorded electrical patterns from multiple locations across the scalp, digitally converted and analyzed the patterns, and then presented the data in a format providing colored headmaps to indicate levels of deviation from mean reference scores. T. 714. Mr. Jordan's score was 1.6 out of 10. T. 754. He also had Brain SPECT imaging, which is designed to show areas of the brain that work well, work too hard, and do not work hard enough. T. 743. Mr. Jordan's scan revealed moderate decreased activity of the right temporal lobe, right inferior orbital prefrontal cortex (at rest), medial and left parietal lobes (worst at rest) and along the longitudinal fissure, as well as mild decreases of activity of the right parietal lobes, left temporal lobe, left interior prefrontal cortex, and anterior medial prefrontal cortex pole. T.743. Based upon these findings, which are consistent with a history of brain injury, Dr. Bennett assessed 1) effects electric current; 2) ADD; 3) Anxiety Disorder NOS, with post

traumatic and obsessive features; 4) Anxiety Disorder NOS, with features of Panic

Disorder; 5) Depressive Disorder NOS; 6) Mood Disorder NOS; 7) Insomnia NOS;

8) IBS; and 9) GERD. T. 743, 745-46.

On August 20, 2015, Dr. Gawlik completed a medical source statement in

which she indicated Mr. Jordan suffered significant problems with processing speed;

was severely impaired with regard to attention; and demonstrated severe impairment

on a CTMT, which was consistent with neuropsychological compromise and severe

short-term memory problems. T. 797-802. Dr. Gawlik opined claimant's ability to

maintain socially appropriate behavior was "seriously limited," he had "no useful

ability to function" with regard to accepting instructions and responding

appropriately to criticism from superiors, and he would be "unable to meet

competitive standards" with regard to his ability to get along with co-workers or

peers without unduly distracting them or exhibiting behavioral extremes. T. 797-

802. She assigned a GAF score of 41. [7] T. 797-802.

---

[7] The GAF rating has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within the range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th ed., text rev., 2000). A GAF between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning;" a GAF between 61 and 70 indicates "mild" symptoms or "some difficulty in social, occupational or school functioning," but "generally functioning pretty well;" a GAF score between 71 and 80 indicates transient and expectable reactions to psychosocial stressors and no more than a slight impairment in social, occupational, or school functioning; a GAF score between 81 and 90 indicates no or minimal symptoms and good functioning in all areas. *Id.* The most recent edition of the Diagnostic and Statistical Manual no longer recommends use

In another third-party questionnaire, completed March 4, 2015, Mr. Jordan's then ex-wife indicated he was limited in the ability to cook/prepare meals, clean, do laundry, shop, and drive. T. 307-09. She also indicated he had difficulty standing and walking (with regard to walking, she noted he was supposed to walk daily, but would only walk a block before stopping). T. 307-09. With regard to his ability to function, she said "all he wants to do is lay down, can't do anything if you're laying in bed most time." T. 312.

On June 26, 2014, Mr. Jordan had Videonystagmography (VNG) testing with Richard Newman, M.D. T. 439-43. Dr. Newman's impression was significant central vestibular dysfunction evidenced by inadequate suppression of the torsion swing. T. 443. Several months later, Mr. Jordan saw ear, nose, and throat specialist, Jack Kotlarz, M.D. T. 459. Mr. Jordan reported a sense of "being off," "not being in tune with situations," and unsteadiness. T. 459. He had physical therapy (specifically, vestibular rehabilitation) at Select Physical Therapy from August 21, 2014, through September 19, 2014, due to ongoing balance/vertigo issues, having fallen twice in six months. T. 538-74. On September 16, 2014, he reported to his physical therapist that he still felt the need to rock constantly and as if he was going

---

of the GAF scale, acknowledging "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

to fall backward at anytime; he also said he was frustrated and having memory issues. T. 570.

On December 16, 2014, Mr. Jordan followed up with William Marshall, M.D., from Orthopedic Associates. T. 681-83. Mr. Jordan reported some improvement with physical therapy. T. 681. Dr. Marshall compared Bertec computerized posturography balance stability scores with previous scores from a November 6, 2014, study, both of which indicated worsened balance stability. T. 684. Dr. Marshall noted that although claimant showed some improvement, his scores were still below the third standard deviation. T. 633-35.

On or about December 31, 2014, Mr. Jordan presented to the office of his primary care physician, Edward A. Schuka, M.D., to discuss a possible EMG and change in the Amitriptyline dosage. T. 618-19. Notes reflect claimant was interested in decreasing his dosage but was still experiencing episodic numbness/tingling despite multiple evaluations and treatment. T. 618-19. Claimant saw Dr. Schuka again on January 13, 2015, at which time he sought a referral to Laser Spine Institute for a second opinion on minimally invasive back surgery. T. 616-17. Dr. Schuka assessed cervicalgia, injury, and shoulder and upper arm and back pain. T. 616-17.

Mr. Jordan returned to Dr. Schuka's office a couple of weeks later, on January 29, 2015. T. 614-15. He requested a cane for balance and continued to complain of

dizziness, memory issues, and other concerns related to the incident. T. 614-15. Dr. Schuka noted injury of the face and neck, injury of the shoulder and upper arm, vertigo, and memory difficulties and placed Mr. Jordan on the anti-vertigo medication, Antivert. T. 614-15.

.At the hearing, claimant testified he suffered from balance problems, which rendered his gait unstable and made him prone to fall. T. 72, 74. He also testified to tightness in muscles, left arm numbness, and constant lower back pain. T. 79-80, 82. He said his family members helped him around the house with cooking (although he was able to use a microwave), laundry, and dishes. T. 86. He explained he had undergone pain management and been prescribed Lyrica and Amitriptyline, as well as Antivert for dizziness. T. 71; 76. With regard to his ability to walk, he said on a good day, he may be able to walk half a block, but on a bad day, he may only be able to walk about 20 feet before his muscles tightened. T. 81.

Claimant said he began treating with Dr. Shuka right after the incident and, at one point, was seeing Dr. Schuka 2 to 3 times per week for 30 minutes, on average. T. 83. Dr. Schuka indicated Mr. Jordan suffered from "continued issues w/balance and other neurological issues despite extensive treatment/PT/balance retraining" and having "been compliant w/specialist appts and treatments but has shown little progress." T. 783-84. On August 18, 2015, Dr. Schuka completed a medical source statement opining Mr. Jordan could be expected to tolerate less than 1 hour of

walking, standing, and sitting in an 8-hour workday. T. 795-96. Dr. Schuka further opined Mr. Jordan could lift less than 5 pounds frequently and 10 to 20 pounds occasionally, but never more than 20 pounds. T. 795-96. He also indicated claimant was restricted in his ability to climb and bend, would require rest periods of 10 to 15 minutes every 45 minutes to an hour, and would be absent from work 4 or more days a month due to impairments or treatment. T. 795-96.

In her decision, the ALJ found Mr. Jordan suffers from the following severe impairments: "residuals of electrical shock with complaints of diffuse body pain; dizziness and balance issues; cognitive (memory) impairment from electrical shock; and lumbar degenerative disc disease." T. 29, 34. She noted claimant was 49 years old, which is defined as a younger individual, on the alleged onset date, but subsequently changed age categories to closely approaching advanced age (age 50). T. 46. She observed past relevant work as a heavy equipment operator and cable television installer, which he no longer was able to perform. T. 45-46.

With regard to RFC, the ALJ determined Mr. Jordan could perform light work but only occasionally climb ladders, ropes and scaffolds; could not have concentrated exposure to unprotected heights; could frequently climb ramps and stairs; and could understand, remember, and carry out simple, repetitive instructions and persist at that level for 8 hours a day, 5 days a week consistently. T. 36, 46. The ALJ noted Mr. Jordan "helps with the household needs;" "takes the trash out;" "is

able to prepare a simple meal, such as a sandwich and soup;" is "able to dress, bathe, use the toilet and feed himself;" and goes out "only when necessary, driving a car or riding in a car," mostly with someone accompanying him. T. 35. She further noted "[h]e drives, but not long distances," and "shops in stores once or twice a week." T. 35. Accordingly, she found he suffered only "mild restriction" with regard to activities of daily living. T. 35. The ALJ found mild difficulties with respect to social functioning, observing, in addition to the above, that Mr. Jordan "has a driver's license and shops at Wal-Mart," "talks with his parents or sister weekly," "may go to church once a month," and "gets along 'well, okay' with authority figures." T. 35-36. In finding moderate difficulties with concentration, persistence, or pace, the ALJ further noted Mr. Jordan "can pay bills and handle a savings account" but "uses a recorder when shopping or erase board to remember;" "needs reminders sometimes, but not all the time;" and "does not hand[le] stress or changes in routine well." T. 36.

## ANALYSIS

I.    Treating Physicians

Mr. Jordan first argues the ALJ erred in assigning little weight to the opinions of Dr. Gawlik and Dr. Schuka. T. 43. When determining a claimant's residual functional capacity ("RFC"), the ALJ weighs all of the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 416.920(e). Although doctors'

opinions and notes are taken into consideration, the ALJ must independently determine the claimant's RFC. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010). When deciding the weight to give to a particular medical opinion, the ALJ must consider a number of factors, including: (1) whether the doctor giving the medical opinion examined the claimant, (2) whether the doctor giving the opinion treated the claimant, (3) the evidence the doctor presents to support his or her opinion, (4) whether the doctor's opinion is consistent with the record as whole, (5) if the doctor specializes in a certain field, and (6) other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c).

When a treating physician's opinion regarding a claimant's condition is bolstered by medically acceptable clinical techniques and is consistent with the other evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Opinions by a treating physician on issues reserved for the Commissioner, however, are not entitled to controlling weight. SSR 96-5p, 1996 WL 374189 (Jul. 2, 1996). The Commissioner also is not bound by a treating or examining physician's opinion when "good cause" exists to reject it. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 1986). "Good cause" is present where: (1) the treating physician's opinion is not supported by the evidence; (2) the evidence contradicts the treating physician's opinion; or (3) the treating physician's opinion is conclusory or inconsistent with the

doctor's own medical records. *Phillips*, 357 F.3d at 1241. When "good cause" is present, the ALJ must clearly articulate reason(s) for disregarding the treating physician's opinion. *Id.* Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)); *see also Nyberg v. Comm'r of Soc. Sec.*, 179 F. App'x 589, 591 (11th Cir. 2006).

Here, the ALJ afforded little weight to the opinions of Drs. Gawlik and Shuka, finding them unsupported by the evidence in the record. Dr. Gawlik indicated plaintiff had severe mental limitations and was unable to work. T. 709-13. In December 2014, Dr. Gawlik opined plaintiff was unable to follow work rules and perform at a constant pace and his ability to maintain attention and concentration varied between markedly limited and unable to perform. T. 710. She also opined claimant was markedly limited in the ability to relate to co-workers, work alone or apart in physical isolation from others, and perform repetitive, short cycle work. T. 710. In an opinion dated August 20, 2015, she indicated plaintiff had no useful ability to function in 16 of 25 areas. T. 799-800. According to Dr. Gawlik, plaintiff had suffered from the limitations since the June 6, 2013, incident. T. 802.

Substantial evidence supports the ALJ's finding regarding Dr. Gawlik's opinion. Dr. Gawlik attributed plaintiff's limitations to the June 6, 2013, incident. T. 797, 802. Several medical doctors treated plaintiff after the incident, however, and found no objective evidence to support the symptoms he reported. Indeed, they

found no neurological or other basis for plaintiff's complaints.  T. 345, 645.  One of plaintiff's treating physicians, Dr. Shane M. VerVoort, expressly questioned plaintiff's veracity insofar as his complaints were concerned, as discussed in more detail below.  Moreover, although Dr. Gawlik opined plaintiff had no useful ability to function in the areas of remembering work-like procedures and was unable to meet competitive standards in understanding and remembering very short and simple instructions, Dr. Kesler examined Mr. Jordan for memory deficits and found memory problems but normal attention span and concentration.  T. 400.  Dr. Kesler subsequently administered an EEG to determine whether there was a neurological basis for Mr. Jordan's purported memory loss, and the results were normal.  T. 420-21.

Dr. Gawlik's opinion also is contradicted by plaintiff's activities of daily living.  Dr. Gawlik opined plaintiff had no useful ability to use public transportation.  T. 800.  On May 14, 2014, however, Dr. Kotlarz observed Mr. Jordan was still driving and had experienced no motor vehicle accidents since his injury.  T. 458, 460.  At the hearing, claimant testified he had a driver's license and had last driven a car 3 days ago.  T. 63.  Dr. Gawlik further opined plaintiff had no useful ability in the area of accepting instructions and responding appropriately to criticism from supervisors.  T. 799.  At the same time, Dr. Gawlik described Mr. Jordan as cooperative during the evaluation process and noted he completed all tasks asked of

him.  T. 597.  Other treating physicians described Mr. Jordan's behavior as cooperative and appropriate.  T. 385, 387.  And Mr. Jordan acknowledged he got along with authority figures "ok I guess."  T. 319.

The ALJ also gave little weight to the opinion of Dr. Schuka that plaintiff could not walk, stand, or sit for 1 hour in an 8-hour workday and would miss 4 or more days of work per month.  T. 795.  Again, the ALJ's decision is supported by substantial evidence in the record as there is no objective evidence supporting the limitations Dr. Schuka imposed.  Dr. Schuka's own treatment notes fail to show any significant abnormality upon examination, while notes from several other physicians document generally unremarkable objective findings.  T. 395, 645.  Notably, Dr. VerVoort expressly stated there were no "objective abnormalities."  T. 645.

Contrary to plaintiff's assertion, in rejecting the opinions of Drs. Gawlik and Schuka, the ALJ did not "merely state in support that 'there is no supporting evidence in the record to support such extreme limitations.'"  Doc. 9 at pg. 17.  The ALJ recounted substantial evidence casting doubt on the veracity of plaintiff's complaints and medical findings based thereon, which are strikingly inconsistent with other substantial evidence in the record.

## II.    Residual Functional Capacity

Mr. Jordan next posits the ALJ erred in finding him able to perform the standing and walking required of light work.  A claimant's RFC is the most he can

do despite his limitations and is based on an evaluation of all the relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), (a)(3); Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2 (S.S.A. 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 1996 WL 374183, at *2, 5 (S.S.A 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating assessment of claimant's RFC is an issue reserved for the Commissioner). Here, the ALJ determined Mr. Jordan retained the RFC to perform a range of light work. T. 36.

In assessing Mr. Jordan's RFC, the ALJ properly considered all the relevant evidence, including Mr. Jordan's testimony and treatment records, as well as the opinions of physicians who reviewed the file. T. 36-45. *See* 20 C.F.R. § 404.1545(a)(3). The ALJ relied heavily on Mr. Jordan's activities of daily living and the findings of Dr. VerVoort, whose records show generally unremarkable clinical findings during the period of November 4, 2013, through February 19, 2015, T. 38-40, 44, 642-60, and who repeatedly expressed belief Mr. Jordan exaggerated his symptoms.

Dr. Vervoort began treating Mr. Jordan on November 4, 2013, for complaints of residual effects from the injury he suffered on June 7, 2013. T. 657. At that time, Dr. VerVoort performed physical and neurological examinations, which generally showed no abnormality. T. 658-59. Dr. VerVoort observed full motor strength

throughout both arms and legs and that Mr. Jordan could stand on both legs independently with good balance. T. 659. He also observed a gait with no antalgia and the ability to squat to the floor and rise without difficulty. T. 659. Dr. VerVoort determined plaintiff could work full-time as long as he performed work on the ground. T. 660.

On November 21, 2013, Dr. VerVoort observed no muscle weakness or coordination difficulty that would prevent Mr. Jordan from performing his full-duty work. T. 656. A couple of weeks later, however, on December 5, 2013, Mr. Jordan complained of intermittent spasms in his arms and legs and informed Dr. VerVoort he was working in a modified capacity and did not feel ready to resume full-time work. T. 655. Thereafter, Mr. Jordan complained of worsening symptoms and numerous additional conditions, but Dr. VerVoort was unable to find an objective basis for the complaints. T. 642-54. For example, on January 16, 2014, plaintiff provided Dr. VerVoort with a two-page list of problems he claimed to be experiencing, including severe spasms and short-term memory deficits. T. 653. Dr. VerVoort, however, noted no significant evidence of upper motor neuron disease that would be expected in an individual with the spasms Mr. Jordan reported. T. 653.

Plaintiff also reported he had been let go from his job after remaining on light duty because the employer offered only 12 weeks of light duty work. T. 653-54.

Dr. VerVoort explained that he did not see anything that would prevent Mr. Jordan from returning to full duty work. T. 654. After Mr. Jordan "repeat[ed] how severe the muscle spasms [were] that interefe[d] with his coordination and his safety" and said he did not "feel like he would be able to safely climb ladders, which [was] a routine part of his full duty job," Dr. VerVoort was "a little perplexed on how to proceed," as he could either "opine that Mr. Jordan ha[d] sustained a permanent injury and [would] be unable to return to his full duty job or allow him to resume full duty work." T. 654. Dr. VerVoort decided to give Mr. Jordan the benefit of the doubt and continue the restriction to light duty work, seeing him again in two weeks. T. 654.

When Dr. VerVoort next saw Mr. Jordan, on January 30, 2014, he said he felt Mr. Jordan's complaints were "markedly exaggerated." T. 652. One week later, Dr. VerVoort released Mr. Jordan to full duty work with no ladder climbing or above ground work. T. 651. On March 20, 2014, Dr. VerVoort imposed a 3% whole person impairment rating due to the electric shock, but he later retracted it, stating the rating was hard to justify due to the lack of objective abnormalities. T. 645, 649. He determined claimant's only restriction was avoiding unprotected heights due to complaints of dizziness. T. 645. He found Mr. Jordan's complaints vague and nonspecific and said there were no abnormalities on physical examination to correlate with the multiple problems Mr. Jordan reported. T. 645.

As of July 9, 2014, Dr. Kesler "[d]oubt[ed]" there was a "neurological issue." T. 395. The following month, Dr. VerVoort noted Mr. Jordan "ha[d] a litany of various complaints, most of which [were] vague and nonspecific. He ha[d] no abnormalities on physical examination . . . to correlate with the multiple problems that he report[ed]." T. 645. In Dr. VerVoort's opinion, it was "unlikely that the single electrical shock . . . [was] the cause of all of these complaints." T. 645. Responding to plaintiff's claim his "'whole body' [went] into spasm including his neck," Dr. VerVoort stated "neck spasms would be incredibly unusual with the electrical shock because it would not have affected the spinal cord in the neck region and therefore should not cause neck muscle spasms." T. 645.

After reviewing ImPACT 3 test results, Dr. VerVoort determined conclusively that Mr. Jordan was fabricating his complaints, stating as follows:

> The testing results available for review reveal that Mr. Jordan scored in the first percentile of memory composite verbal and less than the first percentile of memory composite visual. His reaction time composite scored in the second percentile and his visual motor speed composite measured in the fifth percentile. He also reported symptoms in multiple categories at the highest possible level for a total symptom score of 113 where it is noted that anything above 10 could be considered "significant." Mr. Jordan reported to me today that he is able to drive independently. He is able to dress himself independently in the morning and pick out his clothes. He states that he can cook, but he sometimes forgets that objects are cooking and they may burn. He is able to get into his car, drive his car, go to the Walmart, get into the Walmart with a grocery cart, and walk around and pick

items out.  He states that one time he "froze" in the freezer section for several minutes.  He states that he felt like he wanted to "lay down on the floor and scream."  In other words, he describes bizarre behaviors and activities that are inconsistent with what one would expect from a true brain injury.  Additionally, the scores on his ImPACT testing were so severe that even the report indicates that the test might not be valid.  Additionally, if Mr. Jordan's scores on the ImPACT test were accurate, he would not be able to drive a car or dress independently, grocery shop or do any of the other activities of daily life that he presently is able to participate in.  It is my opinion that he markedly exaggerated his symptoms during the test and that he likely purposefully performed poorly on the test in order to exaggerate the consequences of the electrical insult injury.

T. 643.  Dr. VerVoort said he informed Mr. Jordan of his opinion and that no additional testing was needed.  T. 643.  Dr. VerVoort recorded in the chart that plaintiff was "fabricating his complaints of pain and dysfunction and that there [was] really nothing further to offer him.  [He could] no longer provide any type of restrictions based upon [claimant's] subjective complaints and the lack of any objective abnormalities."  T. 643-44.

The ALJ explained she afforded great weight to Dr. VerVoort's opinions because they were supported by clinical and diagnostic evidence and treatment notes from other physicians.  T. 42.  The regulations permit an ALJ to consider whether a medical source opinion is consistent with the record as a whole and to give greater weight to an opinion supported by relevant evidence, particularly medical signs and

laboratory findings. *See* 20 C.F.R. § 404.1527(c)(3)-(4). Substantial evidence supports the ALJ's decision to give great weight to Dr. VerVoort's opinion.

As the ALJ observed, electrodiagnostic studies performed on March 16, 2015, were normal and showed no evidence of cervical radiculopathy, brachial plexopathy, peripheral neuropathy, muscle injury, or nerve entrapment. T. 42, 667. Records from April 2015 show "normal and improved balance stability scores." T. 674. A July 9, 2015, MRI of Mr. Jordan's brain was "essentially normal" and showed no evidence of acute intracranial abnormality. T. 703.

Dr. VerVoort's opinion also was supported by records from Drs. Kesler, Marshall, and Kotlarz, as well as the Spine Institute. T. 395, 680, 791. Again, in July 2014, Dr. Kesler observed normal upper and lower extremity strength and a normal gait. T. 395. Although Mr. Jordan reported a memory problem, Dr. Kesler observed normal recent and remote memory, normal attention span, and normal concentration. T. 395. Dr. Kesler doubted plaintiff had a neurological problem. T. 395.

Similarly, December 2014 records from the Spine Institute show plaintiff appeared healthy, had a normal gait, had no loss of balance during heel to toe testing, and had a full range of cervical mobility and lumbar flexibility. T. 791. Notably, the records also described claimant's mood and affect as "totally appropriate for the examination setting today" and his cognitive functioning as "intact." T. 791. A

March 4, 2015, physical examination by Dr. Marshall was generally unremarkable and showed normal strength and sensation. T. 680. Dr. Marshall described plaintiff's reported symptoms as "vague" and stated "[n]o clear medical problems appear to be the case." T. 680. Jack Kotlarz, M.D., evaluated Mr. Jordan for complaints of dizziness and was unable to find any objective basis for the complaints. T. 459.

In addition to records from four treating sources, the ALJ's RFC finding is supported by the opinions of state agency physicians who reviewed the file to determine Mr. Jordan's physical and mental limitations. T. 126, 128-31. In a residual functional capacity assessment dated April 30, 2015, P.S. Krishnamurthy, M.D., opined plaintiff could perform light work within the following parameters: frequent climbing of ramps and stairs; occasional climbing of ladders, ropes, and scaffolds; and no concentrated exposure to hazards. T. 128-29. In an opinion dated April 21, 2015, James Mendelson, Ph.D., opined claimant did not have a severe mental impairment. T. 126. He found no convincing evidence that the intensity, persistence, and limiting effects of Mr. Jordan's symptoms affected his ability to work. T. 126. Although the ALJ afforded substantial weight to Dr. Mendelson's opinion, she determined Mr. Jordan had greater mental limitations than Dr. Mendelson imposed. T. 43.

Finally, the ALJ noted "claimant's limited use of pain medication, failure to sustain any consistent medical regimen of treatment, lack of hospitalizations, or other significant treatment for pain, as well as activities of daily living," all of which she considered "evidence that supports a finding pain and/or other symptoms are not disabling." T. 45. She determined "the medical evidence does not reasonably support a finding that the claimant's pain and/or other symptoms are so intense and chronic that work activity at all exertional levels would be precluded." T. 45. She thus concluded "claimant's alleged physical and/or mental symptoms and conditions are not of disabling degree" and "claimant would not be precluded from performing, on a regular and sustained basis, the physical requirements of light work." T. 45. The undersigned cannot find the ALJ erred in finding Mr. Jordan capable of light work, as her findings are supported by substantial evidence in the record.

III. Vocational Expert Testimony

As his final assignment of error, Mr. Jordan argues the ALJ erred in "mechanically relying" on the medical-vocational guidelines and failing to obtain vocational expert testimony regarding jobs claimant can perform. Doc. 9 at p. 20. Once a claimant proves he can no longer perform his past relevant work, "the burden shifts to the Commissioner to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). One way for the

Commissioner to carry this burden is through an application of the grids.  *See* 20

C.F.R. Part 404, Subpart P, Appendix 2.  As the Eleventh Circuit explained,

> [t]he grids are a series of matrices which correlate a set of variables—the claimant's [RFC] . . . , age, educational background, and previous work experience [including whether the previous work was skilled or unskilled]. Upon the entry of a set of these variables into the appropriate matrix a finding of disabled or not disabled is rendered.

*Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985).

In determining whether exclusive reliance on the grids is appropriate, the ALJ

must first categorize the claimant's impairments as either exertional or

nonexertional.  *See*, *e.g.*, *Phillips v. Barnhart*, 357 F.3d at 1241–43.  Exertional

impairments affect an individual's ability to meet the seven strength demands of the

job:  sitting, standing, walking, lifting, carrying, pushing, and pulling.  *Id.* at 1241

n.11.  Nonexertional impairments affect an individual's ability to meet other work-

related demands and include limitations such as pain, medication side effects, and

depression.  *Id.*; *MacGregor*, 786 F.2d at 1054.  An ALJ may rely exclusively on the

grids when each factor used in the determination describes the claimant's situation

and when the case involves only exertional impairments.  *Foote*, 67 F.3d 1553, 1559

(11th Cir. 1995).  In contrast, if the claimant has a nonexertional impairment that

limits a wide range of work at a given level, an ALJ is required to consult a

vocational expert.  *Id.*

Here, the ALJ specifically found Mr. Jordan's nonexertional limitations --
avoiding activities involving concentrated exposure to unprotected heights and only
occasionally climbing of ladders, ropes and scaffolds -- "d[id] not substantially erode
the light, unskilled occupational job base." T. 46. As Social Security Ruling 83-14
recognizes, "[r]elatively few jobs in the national economy require ascending or
descending ladders and scaffolding." 1983 WL 31254, *2 (S.S.A. 1983). Moreover,
as the Commissioner notes, the mental limitations in the RFC are encompassed by
the Grids, which take administrative notice of the numbers of unskilled jobs at the
various exertional levels existing in the national economy. *See* 20 C.F.R. Part 404,
Subpart P, app. 2, § 200.00(b); *Jordan v. Comm'r of Soc. Sec. Admin.*, 470 F. App'x
766, 770 (11th Cir. 2012). Unskilled jobs involve work requiring little or no
judgment for simple duties that can be learned on the job in a short period;
understanding, remembering, and carrying out simple instructions; making simple
work-related decisions; dealing with changes in a routine work setting; and
responding appropriately to supervision, co-workers, and usual work situations. *See*
20 C.F.R. § 404.1568(a); Social Security Ruling (SSR) 96-9p, 61 Fed. Reg. 34, 478-
01 (July 2, 1996), SSR 85-15, 1985 WL 56857. Using the Grids as the framework,
the ALJ properly determined plaintiff's RFC did not preclude him from performing
jobs existing in significant numbers in the national economy. T. 46. Indeed, the

ALJ found no mental limitations prohibiting unskilled work. The ALJ was not required to obtain vocational testimony regarding jobs claimant could perform.

## CONCLUSION

For the reasons set forth above, the undersigned finds the Commissioner's decision supported by substantial evidence and application of the proper legal standards. It therefore should be affirmed.[8]

Accordingly, it is ORDERED:

1.    The decision of the Commissioner is AFFIRMED, and plaintiff's application for Disability Insurance Benefits is DENIED.

2.    The clerk is directed to close the file.

At Pensacola, Florida this 12th day of July, 2017.

*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[8] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The court further notes that plaintiff cited to very little record evidence in support of his position, making general assertions rather than pointing to specific evidence the AJL did not consider or did not assign sufficient weight.